UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

01 NOV 20 PH 1: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| CHECK CASHING SERVICE OF | ) | |
| ALABAMA, INC., d/b/a CHECK | ) | |
| CASHING SERVICES OF | ) | |
| HUNTSVILLE, | ) | |
|  | ) | |
| **Plaintiff,** | ) | |
|  | ) | |
| v. | ) | Civil Action No. CV-00-696-NE |
|  | ) | |
| HARTFORD CASUALTY INSURANCE | ) | |
| COMPANY; BB&T PARSONS | ) | |
| INSURANCE SERVICES; MARY | ) | |
| PARSONS | ) | |
|  | ) | |
| **Defendants.** | ) | |

**ENTERED**

NOV 2 0 2001

## MEMORANDUM OPINION

Plaintiff, Check Cashing Service of Alabama, Inc., asserts claims against defendant Hartford Casualty Insurance Company ("Hartford") for its alleged breach of contract, negligence, wantonness, and bad faith refusal to defend and indemnify plaintiff in a state court action. Plaintiff also asserts claims of negligent hiring, supervision, retention, and training against Hartford and defendant BB&T Parsons Insurance Services ("BB&T Parsons"). Finally, plaintiff asserts claims of fraudulent misrepresentation and suppression of material facts against Hartford, BB&T Parsons, and defendant Mary Parsons. The action presently is before the court on defendants' motions for summary judgment. Upon consideration of the pleadings, evidentiary submissions, and briefs of counsel, this court concludes the motions are due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 permits any party to a civil action to move for summary judgment upon a claim, cross-claim, or counterclaim on which there is no genuine issue of material



fact, and upon which the moving party is entitled to prevail as a matter of law.

> The judgment sought *shall be rendered forthwith if* the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or established facts the moving party is entitled to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See, e.g., Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the opposing party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the opposing party must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The non-moving party must come forward with more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party."

*Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

When deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving party, and, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover, inferences that are "merely colorable,"[1] conclusory,[2] or conjectural, do not create a genuine issue of material fact. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). In short, to avoid summary judgment, the opposing party must come forward with specific facts that are "material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicious." *American Lease Plans, Inc. v. Silver Sand Co. of Leesburg, Inc.*, 637 F.2d 311, 315 (5th Cir. 1981).[3]

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the

---

[1] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988).

[2] *See Johnson v. Fleet Finance, Inc.*, 4 F.3d 946, 949 (11th Cir. 1993); *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989).

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

"evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*,

64 F.3d at 594 (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).

> The mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the outcome of
> the case. The relevant rules of substantive law dictate the materiality of a disputed
> fact. A genuine issue of material fact does not exist unless there is sufficient
> evidence favoring the nonmoving party for a reasonable jury to return a verdict in its
> favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City*

*of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks and citations omitted)); *see*

*also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

The bottom line is "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II. SUMMARY OF FACTS

Check Cashing Service of Alabama, Inc. ("Check Cashing Alabama"), is an Alabama

corporation engaged in the business of cashing checks for a fee.[4] It is wholly owned by James A.

Blair and his wife, Marsha D. Blair.[5] J. W. Blair, the son of James and Marsha Blair, served as

president of the corporation from 1995 until it ceased operations during August of 1998.[6] J. W.

Blair holds a business degree with a concentration in finance and resource management from North

Carolina State University.[7] All consumer transactions of Check Cashing Alabama were conducted

in the State of Alabama; even so, the executive functions of the corporation were conducted by J.

---

[4] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit B (J. W. Blair deposition), at 12.

[5] *Id*. at 8, 12.

[6] *Id*. at 12, 93.

[7] *Id*. at 7.

4

W. Blair from his office in Greenville, North Carolina,[8] where he also served as president of "Check Cashing Headquarters of North Carolina, LLC," an entity owned by J. W. Blair and his sisters.[9]

Lindsey Crisp served as Chief Financial Officer of Check Cashing Alabama from 1996 until August of 1998, when the corporation ceased operations.[10] Crisp holds a degree in accounting from East Carolina University and is a Certified Public Accountant.[11] He participated in the acquisition of insurance coverage for the corporation and its various operations, and was primarily responsible for handling any insurance issues that arose.[12]

Check Cashing Alabama charged a fee for the service of cashing a consumer's check. The amount of the fee varied based upon the type of check presented and an assessment of various risks.[13] When determining the fee to be charged, employees would attempt to verify the information on the check, identify the person presenting the check, and confirm that no holds had been placed on the check.[14] Further, checks in excess of "one percent of the person's annual salary" would not be cashed,[15] because the household income of typical Check Cashing Alabama customers did not exceed $35,000 a year.[16]

Mary Parsons opened BB&T Parsons in Greenville, North Carolina during June of 1990.[17]

---

[8] *Id.* at 13, 131.

[9] *Id.* at 8, 32.

[10] *Id.*, Exhibit A (Crisp deposition), at 6. Crisp testified that he served as the Chief Financial Officer for "Check Cashing Headquarters of North Carolina, LLC," and that Check Cashing Headquarters was the parent company for Check Cashing Alabama. J. W. Blair, however, testified that Check Cashing Alabama has never been a subsidiary of any corporation, but only shared management with Check Cashing Headquarters of North Carolina, LLC. *Id.*, Exhibit B (J. W. Blair deposition) at 127.

[11] *Id.*, Exhibit A (Crisp deposition), at 6-7.

[12] *Id.* at 7; *id.*, Exhibit B, (J. W. Blair deposition), at 15.

[13] *Id.*, Exhibit B (J. W. Blair deposition) at 24.

[14] *Id.* at 25-26.

[15] *Id.* at 28.

[16] *Id.* at 27.

[17] *Id.*, Exhibit E (Parsons deposition), at 14-15.

Ms. Parsons is a licensed insurance agent in the state of North Carolina, and serves as vice-president and agency manager for BB&T Parsons.[18] She has provided insurance coverage for businesses owned by the Blair family since 1989.[19] BB&T Parsons is a component of BB&T Insurance Services, Inc., which operates more than fifty insurance agencies in the State of North Carolina.[20] BB&T Parsons is an agent for Hartford,[21] but it also places insurance with 45 to 50 other insurance companies.[22]

During 1995, Mary Parsons voluntarily admitted herself to a 28 day program for alcohol abuse at Friendship Hall in Highpoint, North Carolina.[23] Although she occasionally missed work prior to seeking treatment, Parsons asserts that her alcohol problem never affected her work.[24]

Lindsey Crisp called Mary Parsons in August of 1995, regarding insurance for a new business venture, Check Cashing Alabama.[25] Crisp and J. W. Blair thereafter met with Parsons.[26] During this meeting, Blair told Parsons about a lawsuit in which the Tennessee check cashing industry had been attacked based on the service fees charged consumers.[27] He requested insurance coverage to protect his business "if that situation occurred in Alabama or North Carolina."[28] Although Blair testified that he attended the meeting specifically to request protection against such an eventuality,[29] he could not confirm that he told Parsons the Tennessee suit focused upon

---

[18] *Id.* at 15, 26-27.

[19] *Id.* at 33.

[20] *Id.* at 15.

[21] *Id.* at 28.

[22] *Id.*

[23] *Id.* at 24-25.

[24] *Id.* at 25; *id.*, Exhibit G (Page deposition), at 54-58.

[25] *Id.*, Exhibit E (Parsons deposition), at 37.

[26] *Id.*, Exhibit B (J. W. Blair deposition), at 42; *id.*, Exhibit A (Crisp deposition), at 10.

[27] *Id.*, Exhibit B (J. W. Blair deposition), at 45-51.

[28] *Id.* at 46; *see also id.*, Exhibit A (Crisp deposition), at 10.

[29] *Id.*, Exhibit B (J. W. Blair deposition), at 46.

violations of that State's usury laws.[30]

> Q.   Okay. You just said, "I've heard about a lawsuit in Tennessee that attacks our industry." *Do you even know if you said anything about the fact that the allegation is that we're charging exorbitant interest rates or violating usury laws? Did you tell her that, that it was about that?*
>
> A.   *I don't know if I told her that or not.*[31]

Blair testified that Parsons represented that she could provide insurance coverage to protect Check Cashing Alabama in the event a suit was filed against it involving allegations similar to those made in the Tennessee lawsuit.[32]

Blair and Crisp believed that Check Cashing Alabama obtained *three* Hartford insurance policies through Mary Parsons in 1995: a general liability policy, an umbrella policy, and a workers compensation policy.[33] According to Parsons, however, Check Cashing Alabama purchased only a workers compensation policy in 1995, and did not acquire coverage under either a general liability or umbrella policy until October of 1997.[34] In any event, during the period of time relevant to this action Check Cashing Alabama was covered by a commercial general liability policy and an umbrella liability policy, both purchased from Hartford in the name of "Check Cashing

---

[30] *Id.* at 51.

[31] *Id.* at 50 (emphasis supplied).

[32] *Id.* at 106; *id*, Exhibit A (Crisp deposition), at 8. Mary Parsons denies that Blair advised her of any Tennessee lawsuit or made any specific request for coverage. *Id.*, Exhibit E (Parsons deposition), at 53.

[33] *Id.*, Exhibit B (J. W. Blair), at 51, 60; *id.*, Exhibit A (Crisp deposition), at 8.

Mary Parsons' recollection of the sequence of events differs significantly from that of J. W. Blair. According to Parsons, Lindsay Crisp called her on August 24, 1995 and requested that she come out to their office to discuss insurance coverage for a new business venture. *Id.*, Exhibit E (Parsons deposition), at 37. She met with J. W. Blair and Lindsey Crisp at their office to discuss workers compensation insurance for the check cashing operations in Alabama and North Carolina in August of 1995. *Id.* at 38. At this meeting, however, they did not discuss general liability coverage. *Id.* at 39. Following this meeting, Parsons provided them with a workers compensation policy covering their check cashing operations in Alabama and North Carolina. *Id.* at 41. This policy was not with Hartford, but was an assigned risk workers compensation policy. *Id.* On September 26, 1996, Crisp called BB&T Parsons requesting a quote for liability insurance, umbrella coverage, and minimal property insurance coverage for the four "Check Cashing Headquarters, LLC" locations in North Carolina. *Id.* at 43. BB&T Parsons placed this coverage effective October 1, 1996. *Id.* at 43-44. On October 14, 1997, Crisp faxed a request to BB&T Parsons to add the six "Check Cashing Service of Alabama" locations to the existing general liability and umbrella coverage. *Id.*

[34] *Id.*, Exhibit E (Parsons deposition), at 46.

7

Headquarters, LLC."[35] Both policies were issued and addressed to be delivered in North Carolina.[36]

Although J. W. Blair acknowledged receipt of the Hartford policies in issue, he did not review either when they were delivered to his office.[37]  Similarly, Lindsey Crisp did not read the policies.[38]  In fact, no one at Check Cashing Headquarters read the policies in 1995, 1996, or 1997.[39]  Even so, Crisp admitted that he knew of no reason why he could not have understood the policies, if he had bothered to read them.[40]

Under "Coverage A" of the commercial general liability policy, Hartford promised to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'"[41] caused by an "occurrence" within the coverage territory and during the policy period.[42]  The policy defined "bodily injury" as "bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of those at any time."[43]  "Property damage" was defined as "[p]hysical injury to tangible property, including all resulting use of that property."[44]  "Occurrence" was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[45]

Under "Coverage B" of the commercial general liability policy, Hartford promised to pay

---

[35] *Id.*, Exhibit F (Butterwei deposition), at 147 and exhibits 13 and 14 (Commercial General Liability and Umbrella Liability Policies); *see also id.*, Exhibit B (J. W. Blair deposition) at 137.

[36] *Id.*, exhibit 2 (Hartford's response to plaintiff's first interrogatories), at ¶ 8.

[37] *Id.*, Exhibit B (J. W. Blair deposition), at 109,142.

[38] *Id.*, Exhibit A (Crisp deposition), at 33.

[39] *Id.* at 33.

[40] *Id.* at 35.

[41] *Id.*, Exhibit F (Butterwei deposition), Exhibit 13 (Commercial General Liability Coverage Form), at ¶ I(A)(1)(a).

[42] *Id.* at ¶ I(A)(1)(b).

[43] *Id.* (Special Broad Form Commercial General Liability Endorsement), at 7.

[44] *Id.* (Commercial General Liability Coverage Form), at ¶ V15.

[45] *Id.* at ¶ V12.

"those sums that the insured becomes legally obligated to pay as damages because of" a "personal injury" caused by an offense arising out of the business or an "advertising injury" caused by an offense committed in the course of advertising goods, products, or services.[46] "Personal injury" was defined as "injury, other than 'bodily injury', arising out of one or more of" a designated list of offenses.[47] "Bodily injury" was defined as "bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of those at any time."[48]

> Under the terms of the umbrella liability insurance policy, Hartford promised to pay:
>
> those sums that the "insured" must legally pay as "damages" in excess of the "underlying insurance" or the "self-insured retention" when no "underlying insurance" applies, because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies caused by an "occurrence."[49]

With respect to "bodily injury" and "property damage," the umbrella policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in 'bodily injury' or 'property damage' neither expected nor intended from the standpoint of the 'insured,' and includes the use of reasonable force to protect person or property."[50] With respect to "personal injury" and "advertising injury," the umbrella policy defined an "occurrence" as "an offense described in one of the numbered subdivisions of those definitions in this policy."[51]

Check Cashing Alabama was sued in the Circuit Court for Madison County, Alabama during March of 1998, for alleged violations of that State's usury laws.[52] The named plaintiffs in that

---

[46] *Id.* at ¶ I(B)(1).

[47] *Id.* at ¶ V13.

[48] *Id.* (Special Broad Form Commercial General Liability Endorsement), at 7.

[49] *Id.*, exhibit 14 (Umbrella Liability Policy), at ¶ I(A).

[50] *Id.* at ¶ V(H)(1).

[51] *Id.* at ¶ V(H)(2).

[52] *Id.*, Exhibit B (J. W. Blair deposition) at 71.

action, styled *Austin, et al. v. Rapid Cash, et al.*, were Karen Austin, Phyllis A. Byars, and Barbara Blythe. They filed suit individually, and, as representatives of a class of similarly situated persons who had engaged in consumer transactions with a number of check cashing services, including "Check Cashing Services of Huntsville,"[53] one of eight locations within the State of Alabama operated by plaintiff, Check Cashing Alabama.[54] Barbara Blythe was the only named plaintiff to deal with "Check Cashing Services of Huntsville." She alleged that she had "borrowed" $100 from Check Cashing Service of Huntsville on October 8, 1997, and that as consideration for the "loan" she was required to draft a postdated check in the amount of $120.[55] "The term of the loan was two weeks, and the interest charge was $20. ... The interest charges demanded by Check Cashing Services of Huntsville exceeded fifteen dollars per one hundred dollars per year, the maximum amount permitted by § 5-19-3, *Code of Alabama* (1975)."[56] The complaint asserted state law claims for unjust enrichment, unconscionability, outrage, and violations of Alabama Code §§ 5-19-3, 5-19-4, and 5-19-6 (1975).[57] Each count alleged that plaintiffs had sustained damages, "including but not limited to, suffering economic losses and mental pain and suffering."[58]

Lindsey Crisp disagreed with Ms. Blythe's description of her transaction with Check Cashing Alabama's Huntsville location as a "loan." In his words, the company had entered into a "deferred presentment agreement" with Ms. Blythe,[59] under the terms of which she had paid a

---

[53] *See id.*, Exhibit F (Butterwei deposition), exhibit 11 (copy of the first amended complaint filed in *Austin, et al. v. Rapid Cash, et al.*).

[54] J. W. Blair testified that Check Cashing Alabama had nine lease obligations and eight locations open for business at its peak. *Id.*, Exhibit B (J. W. Blair deposition), at 131.

[55] *Id.*, Exhibit F (Butterwei deposition), exhibit 11 (copy of the first amended complaint filed in *Austin, et al. v. Rapid Cash, et al.*) at ¶ 42. Plaintiff was added to the *Austin* action as a named party defendant by the first amended complaint.

[56] *Id.* at ¶¶ 42 & 43.

[57] *Id.* at ¶¶ 44-67.

[58] *Id.* at ¶¶ 47, 50, 53, 56, 61, 64, 67.

[59] *Id.*, Exhibit A (Crisp deposition), at 61-62.

twenty dollar fee for Check Cashing Alabama's commitment to wait two weeks before presenting her $120 check for payment.[60] J. W. Blair testified that there was nothing "accidental" about the fee charged, and that the customer is given paperwork detailing the terms of the "deferred presentment agreement."[61]

J. W. Blair admitted that the terms of Hartford's general liability and umbrella insurance policies required Check Cashing Alabama to notify Hartford upon service of a summons and complaint naming the corporation as a defendant, but that neither he nor any other officer of the corporation had done so until (as shall be seen) many months later, after several significant events had occurred.[62] Specifically, the notice provisions of the commercial general liability policy read as follows:

a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1)    How, when and where the "occurrence" or offense took place;

   (2)    The names and addresses of any injured persons and witnesses; and

   (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.    If a claim is made or "suit" is brought angaint any insured, you must:

   (1)    Immediately record the specifics of the claim or "suit" and the date received; and

   (2)    Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

---

[60] *Id.*, Exhibit B (J. W. Blair deposition), at 152-53 and exhibit 31 (deferred presentment agreement).

[61] *Id.* at 143 and exhibit 31 (deferred presentment agreement).

[62] *Id.* at 69.

   c.    You and any other involved insured must:

         **(1)**    Immediately send us copies of any demands, notices, summonses or
                legal papers received in connection with the claim or "suit";

         **(2)**    Authorize us to obtain records and other information;

         **(3)**    Cooperate with us in the investigation or settlement of the claim or defense
                against the "suit"; and

         **(4)**    Assist us, upon our request, in the enforcement of any right against any
                person or organization which may be liable to the insured because of injury
                or damage to which this insurance may also apply.

   **d.**    *No insured will, except at that insured's own cost, voluntarily make a payment,
         assume any obligation, or incur any expense, other then for first aid, without our
         consent.*[63]

   Blair did not notify Hartford, and request that the company designate counsel to provide a

defense to the *Austin* suit in accordance with the foregoing policy requirements.   Instead, he

contacted an attorney of his own choosing in March of 1998.[64]  On some undisclosed date thereafter,

Blair authorized the attorney to offer the *Austin* plaintiffs $85,000 in damages, and, an additional

$28,344 in attorneys' fees, to settle the claims against "Check Cashing Services of Huntsville."[65]

The offer was rejected.  On September 8, 1998, J. W. Blair, James A. Blair, and their attorneys again

attempted to negotiate a settlement by engaging in mediation with the *Austin* plaintiffs and their

attorneys.[66]  The Blairs offered $300,000.[67]  That offer also was rejected.  Neither J. W. nor James

A. Blair — or, for that matter, any attorney or official of Check Cashing Alabama — notified

Hartford of the pendency of the *Austin* suit prior to either settlement offer.[68]

---

[63] *Id.*, Exhibit F (Butterwie deposition), exhibit 13 (Commercial General Liability Coverage Form), at ¶ III(2)
(emphasis supplied).

[64] *Id.*, Exhibit B (J. W. Blair deposition), at 67.

[65] *Id.* at 165.  The record reveals only that this offer was made prior to the September 8, 1998 mediation.

[66] *Id.* at 163.

[67] *Id.* at 165.

[68] *Id.*

Check Cashing Alabama sold its leasehold interests in all Alabama business locations to "Money Service Centers, LLC, a Michigan limited liability company," on August 21, 1998.[69] The sales contract referenced the pending *Austin* action: "Seller has disclosed to Buyer that Seller is a defendant in a class-action lawsuit now pending under the name Karen E. Austin v. Rapid Cash ... (Case No: CV98-466JWB)."[70] The contract also included the following representations:

> Insurance. All insurance policies covering Seller's real and personal property or providing for business interruption, personal and product liability coverage, and other insurance are in amounts Seller deems sufficient with respect to its assets, properties, business, operations, products, and services as the same are presntly owned or conducted, and all such policies are in full force and effect and the premiums have been paid. There are no claims, actions, suits or proceedings arising out of or based on any of these insurance policies *and no basis for any such claim, action, suit, or proceeding exists.* Seller is not in default with respect to any provisions contained in any such insurance policies *and has not failed to give any notice or present any claim under any such insurance policy in due and timely fashion.*[71]

Check Cashing Alabama first notified BB&T Parsons of the *Austin* suit during October of 1998 — approximately six months after Check Cashing Alabama was named as a defendant to the action, several months after the Blairs had made two unsuccessful attempt to settle the claims against their Huntsville location, and at least two months after they had sold their Alabama business interests.[72] Lindsey Crisp called Mary Page to inform her of the pending class action lawsuit.[73] She asked him to bring the suit papers to her office.[74] Parsons faxed the information received from Crisp to Hartford's claims department on October 5, 1998.[75] This facsimile transmission included a

---

[69] *Id.* at 93-95.

[70] *Id.*, Exhibit D (selected exhibits from depositions of J. W. Blair, Lindsey Crisp, and Jim Blair), exhibit 14 (July 1, 1998 agreement for sale of leaseholds), at ¶ 7.6.

[71] *Id.* at ¶ 10.10 (emphasis supplied); *see also id.*, Exhibit B (J. W. Blair deposition), at 100.

[72] *Id.*, Exhibit E (Parsons deposition), at 64; *id.*, Exhibit B (J. W. Blair deposition), at 73.

[73] *Id.*, Exhibit G (Page deposition), at 49.

[74] *Id.* at 49-50.

[75] *Id.*, Exhibit F (Butterwei deposition), exhibit 6 (October 5, 1998 fax from BB&T Parsons to Hartford).

"General Liability Notice of Occurrence," which described the "occurrence" as follows: "Class action suit — claimant alleges unfair rates charged for services."[76] Attached to the liability notice was a fax from J. W. Blair of Check Cashing Alabama, the *Austin* plaintiffs' first discovery request, and deposition notices for representative of three of the *Austin* defendants.[77]

The documents were faxed to Hartford by Parsons, and they were received by Hartford's regional office in Orlando, Florida, on October 7, 1998.[78] The following day, Check Cashing Alabama's claim was assigned to Christine Butterwei, a claims consultant who began handling Alabama claims for Hartford in 1996.[79] Butterwei had very little information to go on at that time, because the *Austin* complaint was not included in the documents faxed to Hartford.[80] Upon reviewing the available information, Butterwei recorded in Hartford's activity log that Hartford had issued a primary liability policy to "Check Cashing Headquarters, LLC," *and, that a late notice issue was present*.[81] She also noted that a "reservation of rights and/or declination [of coverage] may be in order."[82] Although Butterwei posted a reminder that she should "obtain insured's statement,"[83] she never obtained a recorded statement from any representative of Check Cashing Alabama.[84] (In deposition, she rationalized that omission by saying the facts of the case were outlined in the complaint.[85])

That same day (October 8, 1998), Butterwei telephoned Lindsey Crisp and requested a copy

---

[76] *Id.*, exhibit 5 (October 5, 1998 General Liability Notice of Occurrence/Claim).

[77] *Id.*, exhibit 12 (attachment to October 5, 1998 General Liability Notice of Occurrence/Claim).

[78] *Id.*, Exhibit F (Butterwei deposition), at 59, 91-93.

[79] *Id.* at 13, 46, 66.

[80] *Id.* at 69.

[81] *Id.* at 67. Hartford never denied coverage to Check Cashing Alabama based on late notice. *Id.* at 220.

[82] *Id.* at 68-69 and exhibit 4 (October 8, 1998 entries on claim setup sheet).

[83] *Id.*, exhibit 3 (Hartford activity log entry dated 10/08/98).

[84] *Id.*, Exhibit F (Butterwei deposition), at 78, 84,-85, 218.

[85] *Id.* at 133.

of the *Austin* complaint.[86]  Crisp verbally related a synopsis of the claims alleged by the *Austin* plaintiffs, and agreed to send Butterwei a copy of the pleadings by overnight mail.[87]  Later that day, Butterwei faxed a letter to Crisp, advising that coverage issues existed, and reminding him to forward her "the Summons, the Complaint and all the pleadings contained therein."[88]  Other than Butterwei's conversation with Crisp, Hartford did not investigate the incidents alleged in the *Austin* lawsuit.[89]

Butterwei called Crisp again on October 12, 1998, because she still had not received copies of the *Austin* pleadings.[90]  Crisp said that Check Cashing Alabama's attorney, Claudia Callaway, would forward the pleadings to Hartford.[91]  Butterwei and Crisp did not discuss any further details of the *Austin* suit during that telephone conversation.[92]

Four days later, when Butterwei still had not received copies of the pleadings, she wrote Callaway, requesting a copy of the summons and complaint, and informing her that Hartford could not complete its coverage analysis before receiving them.[93]

Butterwei received a facsimile transmission from Callaway three days later, on October 19, 1998.  That transmission included a copy of the first amended complaint.[94]  Butterwei reviewed the complaint and drafted a nine page reservation of rights letter that same day.[95]  She noted that Barbara

---

[86] *Id*. at 78.

[87] *Id*. at 79.

[88] *Id*. at 93-94 and exhibit 8 (October 8, 1998 letter from Butterwei to Crisp).

[89] *Id*. at 88-89.

[90] *Id*. at 99.

[91] *Id*.

[92] *Id*. at 99-100.

[93] *Id*. at 100 and exhibit 9 (October 16, 1998 letter from Butterwei to Callaway).

[94] *Id*. at 103, exhibit 10 (October 19, 1998 facsimile from Callaway to Butterwei), and exhibit 11 (first amended complaint in *Austin, et al. v. Rapid Cash, et al.*)

[95] *Id*. at 103-113 and exhibit 3 (Hartford activity log entry dated 10/19/98).

Blythe was the only plaintiff asserting claims against Check Cashing Alabama.[96]  Although all *Austin* plaintiffs claimed mental pain and suffering under all counts of the complaint, Butterwei did not see how an "occurrence" as defined by the policy caused the alleged "bodily injury."[97]  Specifically, she noted that the policy defined an "occurrence" as an "accident," but Check Cashing Alabama, by design, charged twenty dollars for the services of advancing $100 in cash to Barbara Blythe in return for its agreement to delay presentment of Blythe's $120 check for two weeks.[98]  Butterwei also questioned whether "Check Cashing Services of Huntsville" was an insured, because the "named insured" in each Hartford policy was "Check Cashing Headquarters, LLC," a North Carolina entity.[99]  Butterwei also requested a certified copy of the umbrella policy from Hartford's home office.[100]

That same day, Butterwei telephoned Mary Page at BB&T Parsons to inquire into the insured status of Check Cashing Alabama and "Check Cashing Services of Huntsville."[101]  She testified from her activity log as follows:

> Still on 10-19 I contacted [Mary] Paige [sic] at the Parsons Agency.  She told me about the Huntsville location as an insured location on the policy.  She knows it was the intent of the agency, and she believes it was of Hartford to insure that location.  She did not know what the relation was between Check Cashing Services of Huntsville and Cash [sic] Cashing Headquarters.

> She believes they are the same entity and the Huntsville name is the one that designates where the location is.[102]

Butterwei received the declarations page on the commercial general liability policy from

---

[96] *Id.*, exhibit 13 (Hartford activity log entry dated 10/19/98).

[97] *Id.*

[98] *Id.*

[99] *Id.*, Exhibit F (Butterwei deposition), at 136-37.

[100] *Id.* at 113, 117.

[101] *Id.* at 109.

[102] *Id.* at 109 and exhibit 3 (Hartford activity log entry date 10/19/98).

BB&T Parsons — showing the endorsements, including the endorsements relating to the umbrella policy — on October 21, 1998.[103]  She also made arrangements to "roundtable" (*i.e.*, discuss) the claim with her team leader, Jeff Armstrong, and assistant claims manager, Manuel Martin, on October 23, 1998.[104]  That afternoon, Jeff Armstrong reviewed the claim file and approved Butterwei's draft of the reservation of rights letter to Check Cashing Alabama.[105]

Butterwei mailed the reservation of rights letter to Check Cashing Alabama's attorney, Claudia Callaway, on October 22, 1998.[106]  This letter addressed the coverage issues, and reserved Hartford's right to decline coverage for defense and indemnity, if Butterwei's investigation concluded that the allegations in the *Austin* suit did not fall within the policy definitions for "advertising injury," "bodily injury," "personal injury," or "property damage."[107]  The letter also stated that Hartford could not accept tender of the lawsuit at that time.[108]  Butterwei acknowledged that "mental anguish" qualified as "bodily injury" under Alabama law, but asserted that "mental anguish" must arise out of an "occurrence" as defined by the policy.[109]  She also observed that intentional "bodily injury" was specifically excluded from coverage.[110]  Finally, she questioned whether "Check Cashing Service of Huntsville" was a covered entity under Hartford's policies.[111]

The following day, Butterwei attended the roundtable meeting with assistant claims manager

---

[103] *Id.* at 118.

[104] *Id.* at 118-19 and exhibit 3 (Hartford activity log entry date 10/21/98).

[105] *Id.* at 118, 124 and exhibit 3 (Hartford activity log entry date 10/21/98).

[106] *Id.* at 121, 124 and exhibit 12 (October 22, 1998 letter from Butterwei to Callaway).  It should be observed, however, that Butterwei had mailed the reservation of rights letter to Check Cashing Alabama's attorney, Claudia Callaway, on October 22, 1998, prior to the roundtable discussion scheduled for October 23, 1998.

[107] *Id.* at 122-23 and exhibit 12 (October 22, 1998 letter from Butterwei to Callaway).

[108] *Id.* at 124 and exhibit 12 (October 22, 1998 letter from Butterwei to Callaway).

[109] *Id.*, exhibit 12 (October 22, 1998 letter from Butterwei to Callaway).

[110] *Id.*

[111] *Id.*

Manuel Martin, to discuss Hartford's coverage position on Check Cashing Alabama's claim.[112] Jeff Armstrong was unable to attend.[113] Butterwei and Martin arrived at a preliminary conclusion that the allegations in the *Austin* complaint did not arise out of an "occurrence" as defined in Hartford's policies.[114] They nevertheless recognized that they needed to obtain copies of all endorsements to the policies, and to consult with Douglas Holbrook, a claims consultant in Hartford's home office, before making a final decision on coverage.[115]

Butterwei telephoned Lindsey Crisp on October 27, 1998, to advise him that the reservation of rights letter had been mailed to Check Cashing Alabama's attorney, Claudia Callaway, and that Hartford could not accept tender of the *Austin* lawsuit until the issue of policy coverage was reviewed.[116] Two days later, Butterwei called Callaway to confirm her receipt of the reservation of rights letter, and to explain that she was waiting for certified copies of the policies to address the coverage issues more closely.[117] Callaway asked whether she could provide any additional information to aid Butterwei in her evaluation, but Butterwei responded that she did not need any.[118]

Butterwei received certified copies of Hartford's policies on November 2, 1998, and proceeded to revise her reservation of rights letter.[119] Two days later, she presented her team leader, Jeff Armstrong, with an updated reservation of rights letter and certified copies of the policies.[120] Butterwei wrote Check Cashing Alabama's attorney, Claudia Callaway, on November 9, 1998,

---

[112] *Id.*, Exhibit F (Butterwei deposition), at 127 and exhibit 3 (Hartford activity log entry dated 10/23/98).

[113] *Id.* at 127.

[114] *Id.* at 127, 130-31.

[115] *Id.* at 131 and exhibit 3 (Hartford log note entry dated 10/23/98).

[116] *Id.*, exhibit 3 (Hartford log note entry dated 10/27/98).

[117] *Id.*, Exhibit F (Butterwei deposition), at 136.

[118] *Id.* at 136.

[119] *Id.* at 137.

[120] *Id.* at 137-38 and exhibit 3 (Hartford log note entry dated 11/04/98).

advising her of the problems in ascertaining whether the Huntsville location qualified as an insured under the policies.[121]  On December 4, 1998, Butterwei received a letter from Mary Page at BB&T Parsons confirming that Check Cashing Alabama's Huntsville location was added to the policy as an insured effective October 1, 1997.[122]

Butterwei then wrote Jeff Armstrong, proposing that they provide copies of the pleadings to claims consultant Douglas Holbrook, for an opinion on coverage.[123]  Butterwei recommended declining coverage based on the pleadings and policy provisions.[124]  Armstrong reviewed the claim file on December 9, 1998, and concurred with Butterwei's conclusion that the *Austin* lawsuit was not covered.[125]

Butterwei electronically mailed a letter to Douglas Holbrook recommending declination of coverage, and attaching copies of the *Austin* pleadings, on December 10, 1998.[126]  The next day, she faxed Holbrook the proposed declination of coverage letter, and called him to discuss the claim.[127]  Holbrook approved the declination letter.[128]  During this conversation, Holbrook stated that they would likely hear from the insured again, due to the "mental anguish" allegations in the *Austin* complaint, and that Hartford would readdress its position at that time.[129]

Butterwei mailed a letter to Claudia Callaway on December 14, 1998, declining to defend or indemnify Check Cashing Alabama in the *Austin*.[130]  Copies of the October 22, 1998 and

---

[121] *Id.* at 141-42 and exhibit 3 (Hartford log note entry dated 11/04/98).

[122] *Id.* at 149-52 and exhibit 3 (Hartford log note entry dated 12/04/98).

[123] *Id.* at 152-53 and exhibit 3 (Hartford log note entry dated 12/04/98).

[124] *Id.* at 152-53.

[125] *Id.* at 154 and exhibit 3 (Hartford log note entry dated 12/09/98).

[126] *Id.* at 170 and exhibit 20 (December 10, 1998 letter from Butterwei to Holbrook).

[127] *Id.* at 154 and exhibit 3 (Hartford log note entry dated 12/11/98).

[128] *Id.* at 154 and exhibit 3 (Hartford log note entry dated 12/11/98).

[129] *Id.* at 154 and exhibit 3 (Hartford log note entry dated 12/11/98).

[130] *Id.* at 216 and exhibit 18 (December 14, 1998 letter from Butterwei to Callaway).

November 9, 1998 letters were attached to the declination letter, which stated that the "coverage issues we have addressed in both these letters are still present based on the current allegations contained in" the first amended complaint in the *Austin* lawsuit.[131] The declination letter stated that none of the allegations in the first amended complaint qualified as an "advertising injury," "bodily injury," "personal injury," or "property damage" as defined by either policy.[132]

Although Butterwei *testified* that Hartford declined coverage because the alleged "mental anguish" did not arise out of an "occurrence," the declination *letter* makes no mention of an "occurrence."[133]

Butterwei received a telephone call from James A. Blair, who along with his wife Marsha was one of the co-owners of Check Cashing Alabama, on December 21, 1998.[134] He stated that the *Austin* lawsuit should be covered under the umbrella policy, because Check Cashing Alabama was innocent of the allegations contained in the complaint.[135] Blair stated that he would fax Butterwei a letter written by Claudia Callaway.[136] Butterwei told Blair that Hartford would reconsider its coverage position upon receipt of a written response from Check Cashing Alabama or its attorney articulating the reasons they believed coverage existed under the umbrella policy.[137]

Butterwei received a letter from Claudia Callaway on December 22, 1998,[138] which argued that the *Austin* plaintiffs' claim of outrage qualified as a "personal injury" under both policies.[139]

---

[131] *Id.*, exhibit 18 (December 14, 1998 letter from Butterwei to Callaway).

[132] *Id.*

[133] *Id.*

[134] *Id.*, exhibit 3 (Hartford log note entry dated 12/21/98).

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.*, exhibit 3 (Hartford log note entry dated 12/22/98) and exhibit 19 (December 18, 1998 letter from Callaway to Butterwei).

[139] *Id.*

Callaway did not dispute Hartford's position that the allegations in the *Austin* suit did not constitute a "bodily injury" under coverage A of the general liability policy.[140]

Butterwei telephoned Douglas Holbrook on December 22, 1998, to review Hartford's coverage position.[141]  Holbrook agreed with Butterwei that the outrage claim did not qualify as an "occurrence" involving "property damage," "bodily injury," "personal injury,"or "advertising injury" under the policies.[142]

Butterwei therefore wrote Callaway later that same day, advising that Hartford had reviewed her December 18, 1998 correspondence.[143]  Butterwei stated that Hartford did not agree that the outrage allegations in the *Austin* complaint qualified as a "personal injury" under the policies, nor did it qualify as an "occurrence."[144]  Butterwei requested copies of any applicable case law in support of Check Cashing Alabama's position.[145]  Calloway never responded to the letter or provided any case law, however.[146]

Butterwei closed the Check Cashing Alabama file on January 20, 1999, because there had been no further activity within the month following her last correspondence.[147]

Butterwei received a telephone call from Check Cashing Alabama's new attorney, Thomas F. Roupas, Jr., on February 11, 1999.[148]  Roupas argued that the *Austin* suit was covered, because the allegations contained in the first amended complaint constituted a "personal injury" that arose

---

[140] *Id.*

[141] *Id.*, exhibit 3 (Hartford log note entry dated 12/22/98);

[142] *Id.*, Exhibit F (Butterwei deposition), at 166.

[143] *Id.* at 172-73 and exhibit 21 (December 22, 1998 letter from Butterwei to Callaway).

[144] *Id.*

[145] *Id.* at 172-73 and exhibit 21 (December 22, 1998 letter from Butterwei to Callaway).

[146] *Id.* at 173.

[147] *Id.*

[148] *Id.* at 176.

out of an "occurrence."[149] He also argued that, even if Hartford was correct in its coverage position, it was bound to provide coverage *under North Carolina law* because Hartford's agent, Mary Parsons, had represented to Check Cashing Alabama's president, J. W. Blair, that such a suit would be covered.[150] Butterwei told Roupas that Parsons would not have been acting within the scope of her authority if she had made such a representation.[151] Following this conversation, Butterwei reopened the Check Cashing Alabama file.[152]

BB&T Parsons received a letter from Roupas dated February 22, 1999,[153] and Mary Parsons telephoned Butterwei concerning the letter on March 4, 1999.[154] Parsons said that she had not represented that coverage would be available.[155] Mary Parsons faxed a copy of the Roupas letter to Butterwei on March 5, 1999.[156] Butterwei spoke with Jeff Armstrong that same day.[157] Armstrong agreed that Butterwei should write Roupas, and inform him that Hartford did not impliedly or expressly authorize Parsons to bind Hartford to the asserted representation, and that their coverage position remained the same as outlined in the October 22nd, December 14th, and December 22nd letters to Claudia Callaway.[158] After conferencing with Armstrong, Butterwei submitted her proposed response letter, along with her declination letter of December 14, 1998, to Douglas Holbrook.[159] She spoke with Holbrook concerning the Check Cashing Alabama claim on March 8,

---

[149] *Id.*

[150] *Id.* at 176-77 and exhibit 3 (Hartford log note entry dated 2/11/99)

[151] *Id.* at 177.

[152] *Id.* at 180.

[153] *Id.*, Exhibit E (Parsons deposition), at 68.

[154] *Id.* at 69; *id.*, Exhibit F (Butterwei deposition), at 184.

[155] *Id.*, Exhibit F (Butterwei deposition), at 184.

[156] *Id.* at 186 and exhibit 22 (February 22, 1999 letter from Roupas to Butterwei)

[157] *Id.* at 187 and exhibit 3 (Hartford log note entry dated 03/05/99).

[158] *Id.* at 187 and exhibit 3 (Hartford log note entry dated 03/05/99).

[159] *Id.* at 187-88.

1999.[160]  Holbrook agreed that there was no "occurrence," "bodily injury," or "personal injury" under the allegations contained in the *Austin* complaint.[161] Holbrook asked Butterwei if Hartford should file a declaratory judgment action regarding the claim.[162] She responded that Check Cashing Alabama's attorney indicated that they would be filing suit *in North Carolina*.[163]

Butterwei mailed a response letter to Roupas on March 9, 1999, stating that Hartford did not provide Parsons with express or implied authority to bind Hartford beyond the language contained in any policy.[164] She also informed him that Parsons denied making the alleged statement regarding coverage, and that Hartford maintained its position that no coverage existed under the policies.[165]

Check Cashing Alabama entered into a *pro tanto* settlement agreement on April 6, 1999,[166] by the terms of which it agreed to deposit $400,000 into "an interest-bearing account at AmSouth Bank in Huntsville, Alabama," and to forego collection of $452,000 in checks written by members of the *Austin* class.[167] The agreement was conditioned upon entry of a final order and judgment by the Alabama court.[168]

Butterwei next heard from Check Cashing Alabama on October 26, 1999, when Mark Boardman, current counsel for the plaintiff, wrote her.  Boardman outlined his contentions that coverage for the *Austin* suit existed under Hartford's policies.[169]  He asserted:  that the reckless

---

[160] *Id.* at 195 and exhibit 3 (Hartford log note entry dated 03/08/99).

[161] *Id.*, exhibit 3 (Hartford log note entry dated 03/08/99).

[162] *Id.*

[163] *Id.*

[164] *Id.*, exhibit 23 (March 9, 1999 letter from Butterwei to Roupas).

[165] *Id.*

[166] Plaintiff's evidentiary submission (doc. no. 50), Exhibit 30 (*Pro Tanto* Settlement Agreement in *Austin et al. v. Rapid Cash et al.*).

[167] *Id.* at 2, 7.

[168] *Id.* at 14.

[169] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit F (Butterwei deposition), exhibit 24 (October, 1999 letter from Boardman to Butterwei).

conduct alleged in the *Austin* complaint is distinct from intentional conduct that is excluded from coverage under the policies; that allegations of reckless conduct constitute an "occurrence" under the policies; and that Hartford ignored its own prior correspondence, the clear language of the policy, and Alabama law when it concluded that mental anguish did not constitute "bodily injury" under the policies.[170] Butterwei both faxed and mailed a letter to Boardman on October 27, 1999, requesting copies of the case law cited in his letter.[171]

That same day, Butterwei faxed the pleadings, Hartford's prior correspondence regarding the Check Cashing Alabama claim, and Boardman's letter to Christopher Devine, a claims consultant in Hartford's home office.[172] The following day, she discussed the claim and coverage issues with Devine.[173] He asked for clarification regarding the basis upon which coverage was declined.[174] Butterwei explained that coverage was declined because there was no "occurrence" as defined by the policies.[175] Butterwei also met with assistant claims manager Manuel Martin on October 28, 1999, and Martin concurred that there was no "occurrence" under the policy.[176]

Butterwei wrote Mark Boardman on November 4, 1999, prior to receiving the Alabama case law she requested from him.[177] She explained that Hartford's position regarding coverage was based on its determination that the acts alleged in the *Austin* lawsuit of charging excessive fees in advancing a loan and failing to comply with the Alabama Code did not constitute an "occurrence"

---

[170] *Id.*

[171] *Id.*, Exhibit F (Butterwei deposition), at 203.

[172] *Id.* at 202 and exhibit 3 (Hartford log note entry dated 10/27/99).

[173] *Id.* at 202, 204 and exhibit 3 (Hartford log note entry dated 10/28/99).

[174] *Id.* at 204-05 and exhibit 3 (Hartford log note entry dated 10/28/99).

[175] *Id.* at 204 and exhibit 3 (Hartford log note entry dated 10/28/99).

[176] *Id.* at 206.

[177] *Id.* at 211-12 , exhibit 3 (Hartford log note entry dated 11/04/99), and exhibit 28 (November 4, 1999 letter from Butterwei to Boardman).

under the policy definitions.[178]  Butterwei received a letter from Boardman on November 18, 1999, enclosing copies of the cases cited in his letter.[179]  She never read any of the cases.[180]

Check Cashing Alabama instituted the present action on February 1, 2000, in the Circuit Court for *Jefferson County*, Alabama.[181]  Defendants removed the action to this court on March 16, 2000, on the basis of diversity jurisdiction.[182]

## II. DISCUSSION

**A.    Choice of Law**

The Supreme Court commands that, where diversity of citizenship is the basis of jurisdiction, the district court is to apply the choice of law rules of the state in which it sits.  *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941).[183]

Count I of plaintiff's complaint asserts a breach of contract claim.[184]  Alabama follows the doctrine of *lex loci contractus*, which provides that contract claims are governed by the law of the place where the contract was executed.  *Harrison v. Insurance Company of North America,* 318 So. 2d 253, 257 (Ala. 1975) (citing *Furst & Thomas v. Sandlin*, 208 Ala. 490, 94 So. 740 (1922)); *see also Twin City Fire Insurance, Co. v. Colonial Life & Accident Insurance, Co.*, 124 F. Supp. 2d 1243, 1247 (M.D. Ala. 2000).  "In the context of insurance cases, the court is obliged to apply the laws of the state where the last act is 'receipt and acceptance' of the insurance policy."  *American Motorists Insurance Company v. Southern Security Life Insurance Company,* 80 F. Supp. 2d 1280,

---

[178] *Id.* at 211-12, exhibit 3 (Hartford log note entry dated 11/04/99), and exhibit 28 (November 4, 1999 letter from Butterwei to Boardman).

[179] *Id.* at 214-15.

[180] *Id.*

[181] Notice of Removal (doc. no. 1), exhibit A (complaint).

[182] Notice of Removal (doc. no. 1).

[183] The Hartford insurance policies at issue did not contain choice of law provisions.

[184] Notice of Removal (doc. no. 1), exhibit A (complaint), at ¶¶ 18-23.

1282 (M.D. Ala. 2000) (citing *Brown Machine Works & Supply, Inc. v. Insurance Co. of North America, Inc.*, 951 F. Supp. 988 (M.D. Ala. 1996)); *see also Industrial Chemical & Fiberglass Corp. v. North River Insurance Company*, 908 F.2d 825, 829 n.3 (11th Cir. 1990) (determining under Alabama's choice of law rule that the receipt and acceptance of the policies by the insured, the last act necessary to the policies' execution, occurred in New York). Here, it is undisputed that the policies in question were received and accepted by plaintiff in North Carolina.[185] Thus, under Alabama law, the court must apply the substantive law of North Carolina to plaintiff's breach of contract claim.

The remaining counts of plaintiff's complaint sound in tort. Alabama follows the doctrine of *lex loci delicti commissi* (commonly referred to in the abbreviated form of "*lex loci delicti*"), which requires the application of the law of the place where the wrong was committed — that is, the place where the last event necessary to make the actor liable for his tortious act occurred. *See Alabama Great Southern Railroad Co. v. Carroll*, 97 Ala. 126, 134, 11 So. 803, 806 (1892); *see also, e.g., Fitts v. Minnesota Mining & Manufacturing Co.*, 581 So.2d 819, 820 (Ala. 1991); *Norris v. Taylor*, 460 So.2d 151, 152 (Ala. 1984). None of plaintiff's tort claims became actionable until plaintiff deposited $400,000 into an Alabama bank account for payment of the *Austin* plaintiffs, and, the Alabama circuit court entered judgment pursuant to the terms of the *pro tanto* settlement agreement. Thus, Alabama is the place of the wrong,[186] and Alabama law governs plaintiff's tort

---

[185] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit F (Butterwei deposition), Exhibit 2 (Hartford's response to plaintiff's first interrogatories), at ¶ 8.

[186] The decision of the Alabama Supreme Court in *Alabama Great Southern Railroad Co. v. Carroll*, 97 Ala. 126, 11 So. 803 (1892), illustrates the importance of the "place of the last event." The plaintiff in *Carroll* was a brakeman for the railroad. He resided in Alabama, but was injured in Mississippi when two train cars uncoupled during a run between the two states. The injury was attributed to a negligent inspection of the train by plaintiff's co-employees in Alabama, which had failed to reveal the defective link that caused the uncoupling. The obstacle to plaintiff's recovery was the common law fellow-servant rule to which the State of Mississippi continued to adhere. Alabama, on the other hand, had enacted a workman's compensation statute that made employers liable for injuries sustained by employees, even as a result of the negligence of fellow-servants, or co-employees. Despite Alabama's several

claims.

## B.      Breach of Contract

Count I of plaintiff's complaint asserts that Hartford breached the terms of its general liability and umbrella policies by failing to defend and indemnify Check Cashing Alabama in the *Austin* suit.[187] The only possible basis for coverage under either policy (and the only one asserted by plaintiff) is the provision providing coverage for damages resulting from "bodily injury" caused by an "occurrence."[188] Hartford denied coverage because the injuries alleged in the *Austin* complaint did not qualify as "bodily injury,"[189] and were not caused by an "occurrence," as defined by either policy.[190]

Under North Carolina law, the insured "has the burden of bringing itself within the insuring language of the policy." *Hobson Construction Co., Inc. v. Great American Insurance Co.*, 71 N.C. App. 586, 590, 322 S.E.2d 632, 635 (1984). The interpretation of language used in an insurance

---

connections with the case, the Court held that plaintiff could not recover, because the place of the last event necessary to impose liability occurred in Mississippi.

> It is admitted, or at least it cannot be denied, that negligence of duty unproductive of damnifying results will not authorize or support a recovery. Up to the time the train passed out of Alabama, no injury had resulted. For all that occurred in Alabama, therefore, no cause of action whatever arose. The fact which created the right to sue, the injury without which confessedly no action would lie anywhere, transpired in the state of Mississippi. It was in that state, therefore, necessarily that the cause of action, if any, arose; and whether a cause of action arose or existed at all or not must in all reason be determined by the law which obtained at the time and place when and where the fact which is relied on to justify a recovery transpired.

*Id.* at 134, 11 So. at 806.

[187] Notice of Removal (doc. no. 1), exhibit 1 (complaint), at ¶¶ 18-23.

[188] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit F (Butterwei deposition), exhibit 13 (Commercial General Liability Coverage Form), at ¶ I(A)(1)(a), and exhibit 14 (Umbrella Liability Policy), at ¶ I(A).

[189] *Id.*, Exhibit F (Butterwei deposition), exhibit 18 (December 14, 1998 letter from Butterwei to Callaway).

[190] *Id.* Copies of the October 22, 1998 and November 9, 1998 letters were attached to the declination letter, which stated that the "coverage issues we have addressed in both these letters are still present based on current allegations contained in" the first amended complaint in the *Austin* lawsuit. *Id.* Further, plaintiff states that "[t]he facts in this case clearly show that Hartford denied coverage because it claims there was 'no occurrence.'" Plaintiff's brief in opposition to summary judgment (doc. no. 51), at 19.

policy is a question of law, to be determined by the court. *Allstate Insurance Co. v. Chatterton*, 135 N.C.App. 92, 94, 518 S.E.2d 814, 816 (1999). When construing the provisions of an insurance policy, any ambiguities in the policy must be resolved in favor of the insured. *Southeast Airmotive Corp. v. United States Fire Insurance Co.*, 78 N.C.App. 418, 420, 337 S.E.2d 167, 169 (1985). The test in deciding whether policy language is plain or ambiguous is what a reasonable person in the position of the insured would have understood it to mean, not what the insurer may have intended. *See Joyner v. Nationwide Insurance*, 46 N.C.App. 807, 809, 266 S.E.2d 30, 31 (1980). The North Carolina Supreme Court has instructed that, when interpreting the terms of an insurance contract, the "[u]se of the plain and ordinary meaning of the term is the preferred construction." *C.D. Spangler Construction Co. v. Industrial Crankshaft & Engineering Co., Inc.*, 326 N.C. 133, 151, 388 S.E.2d 557, 568 (1990).

Further, an insurer's duty to defend its insured is broader than its duty to pay damages incurred by events covered by the policy. *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 691, 350 S.E.2d 374, 377 (1986). The duty to defend ordinarily is measured by the facts alleged in the underlying complaint. *Id.*

> [W]hen the pleadings allege facts indicating that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, then it is not bound to defend.
>
> Where the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the duty to defend is not dismissed because the facts alleged in a third-party complaint appear to be outside coverage, or within a policy exception to coverage. In this event, the insurer's refusal to defend is at his own peril: if the evidence subsequently presented at trial reveals that the events are covered, the insurer will be responsible for the cost of the defense.

*Id.* (citations omitted).

Here "occurrence" is defined by both policies to mean "an accident including continuous or

repeated exposure to substantially the same general harmful conditions."[191] North Carolina courts have found such language to be unambiguous, and have accorded the term "accident" its plain meaning: "an unforseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty." *Id.* at 694, 340 S.E.2d at 379 (*quoting Tayloe v.. Indemnity Co.*, 257 N.C. 626, 627, 127 S.E.2d 238, 239-40 (1962)).

North Carolina draws a distinction between an intentional *act* and intentional *injury*: "[W]here the term 'accident' is not specifically defined in an insurance policy, that term *does* include injury resulting from an intentional act, if the injury is not intentional or substantially certain to be the result of the intentional act." *North Carolina Farm Bureau Mutual Insurance Co. v. Stox*, 330 N.C. 697, 709, 412 S.E.2d 318, 325 (1992) (emphasis in original); *see also id.* at 709, 412 S.E.2d at 325 (concluding that injuries sustained by an individual when he was intentionally pushed by the insured were covered under the insurance policy as an "occurrence" or "accident," because the specific injury sustained — as opposed to the *act* of pushing — was an unintentional result of the insured's intentional act); *Waste Management*, 315 N.C. at 696, 340 S.E.2d at 380 (concluding that the leaching of contaminants into groundwater as a result of the insured's intentional act of dumping waste materials into a landfill for several years was covered under the insurance policy as an "accident," because the leaching was an unintentional result of the insured's intentional act).

"The ultimate focus is on the *injury*, *i.e.*, whether it was expected or intended, not upon the act and whether it was intended." *Holz-Her U.S., Inc. v. United States Fidelity and Guaranty Co.*, 141 N.C.App. 127, 129, 539 S.E.2d 348, 350 (2000) (emphasis in original).  Whether injuries are

---

[191] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit F (Butterwie deposition), exhibit 13 (Commercial General Liability Coverage Form), at ¶ V12, and exhibit 14 (Umbrella Liability Policy), at ¶ V(H)(1).

accidental, and thus satisfy the definition of an "occurrence," depends upon whether they were expected or intended from the insured's point of view. *Waste Management*, 315 N.C. at 696, 340 S.E.2d at 380.

Where the specific injury or damage complained of was "substantially certain" to occur as a result of the insured's intentional act, however, an "[i]ntent to injure may be inferred as a matter of law from the intent to act ...." *Henderson v. U.S. Fidelity & Guaranty Co.*, 124 N.C.App. 103, 111, 476 S.E.2d 459, 464 (1996) (finding insured's intentional misrepresentation and omission regarding property's flooding problems were so substantially certain to cause injury and damage as to infer an intent to injure); *see also Holz-Her*, 141 N.C. App. at 130-31, 539 S.E.2d at 350-51 (finding insured's refusal to lease equipment to a newly formed company after allegedly agreeing to do so was so substantially certain to cause injury and damage as to infer an intent to injure).

The *Austin* complaint alleged, in pertinent part, that Check Cashing Alabama charged Barbara Blythe an interest rate of 20% on a two week loan. The complaint asserted claims for unjust enrichment, unconscionability, outrage, and violations of Alabama Code §§ 5-19-3, 5-19-4, and 5-19-6 (1975).[192] Each count alleged damages, "including but not limited to, suffering economic losses and mental pain and suffering."[193]

Lindsey Crisp disagreed with Ms. Blythe's description of her transaction as "a loan." In his words, Check Cashing Alabama entered a "deferred presentment agreement" with Ms. Blythe,[194] under the terms of which she paid a twenty dollar fee for Check Cashing Alabama's commitment

---

[192] *Id.*, Exhibit F (Butterwei deposition), exhibit 11 (copy of the first amended complaint filed in *Austin, et al. v. Rapid Cash, et al.*) at ¶¶ 44-67.

[193] *Id.* at ¶¶ 47, 50, 53, 56, 61, 64, 67.

[194] *Id.*, Exhibit A (Crisp deposition), at 61-62.

to wait two weeks before presenting her $120 check for payment.[195]  J. W. Blair testified that there was nothing "accidental" about such fees, and that the customer is given paperwork detailing the terms of the "deferred presentment agreement."[196]

Applying the law to these facts, the court concludes that Check Cashing Alabama's behavior did not constitute an "occurrence" as defined by the Hartford policies.  J. W. Blair admitted that Check Cashing Alabama intentionally charged service fees/interest rates such as that alleged by Blythe in the *Austin* lawsuit.[197]  The usurious rate imposed, coupled with Check Cashing Alabama's admittedly impoverished clientele,[198] was substantially certain to cause the "economic losses and mental pain and suffering" alleged by the *Austin* plaintiffs.  Further, the attempt of Check Cashing Alabama's president, J. W. Blair, to obtain insurance coverage to protect the business from just such a lawsuit[199] establishes that he anticipated the company's exorbitant rates would upset and injure clients.  Accordingly, the court holds that "any economic losses or mental pain and suffering" sustained by the *Austin* plaintiffs as a result of Check Cashing Alabama's intentional conduct was not caused by an "occurrence" as defined by Hartford's policies.   It follows, therefore, that Hartford's policies provided no coverage to Check Cashing Alabama for the claims of the *Austin* plaintiffs, and that Hartford had no duty to defend Check Cashing Alabama.  Plaintiff has presented no evidence that Hartford knew, or could reasonably have ascertained, facts that would have been covered by the policies.[200]  Accordingly, Check Cashing Alabama's breach of contract claim is due

---

[195] *Id.*, Exhibit B (J. W. Blair deposition), at 152-53 and exhibit 31 (deferred presentment agreement).

[196] *Id.* at 143 and exhibit 31 (deferred presentment agreement).

[197] *Id.* at 143.

[198] *Id.* at 27.

[199] *Id.* at 45-50.

[200] Because the damages alleged in the *Austin* complaint were not caused by an "occurrence," the court finds it unnecessary to consider whether they qualified as a "bodily injury" under Hartford's policies.

to be dismissed.

## C.     Bad Faith

Count II of plaintiff's complaint asserts a claim of bad faith against Hartford for refusing to

provide plaintiff with a defense or indemnity in connection with the *Austin* class action.[201]

Under Alabama law, an actionable tort of bad faith arises for an insurer's intentional refusal

to settle a direct claim where there is either no lawful basis for the refusal coupled with actual

knowledge of that fact, or intentional failure to determine whether there was any lawful basis for

such refusal. *See Chavers v. National Security Fire & Casualty Co.*, 405 So.2d 1, 7 (1981). The

plaintiff in a so-called "bad faith refusal" case has the burden of proving:

(a)     an insurance contract between the parties and a breach thereof by the defendant;

(b)     an intentional refusal to pay the insured's claim;

(c)     the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

(d)     the insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e)     if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

In short, plaintiff must go beyond the showing of nonpayment and prove a *bad faith* nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.

*National Security Fire & Casualty Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1982).

"In the normal case[,] in order for a plaintiff to make out a prima facie case of bad faith

refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a

---

[201] Notice of Removal (doc. no. 1), exhibit 1 (complaint), at ¶ 25.

directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law." *National Savings Life Insurance Co. v. Dutton*, 419 So.2d 1357, 1362 (Ala. 1982). There are exceptions, however, where the plaintiff need not establish entitlement to judgment as a matter of law on the contract claim in order to prove a bad faith denial of an insurance claim.

> To this date, *the abnormal cases* have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.

*State Farm Fire & Casualty Co. v. Slade*, 747 So.2d 293, 306-307 (Ala. 1999) (emphasis supplied).

Liability under Alabama's tort of bad faith, therefore, normally is limited "to those instances in which the insured's losses were covered under the policy." *Id.* at 317; *see also National Security Fire & Casualty Co. v. Vintson*, 414 So.2d 49, 52 (Ala. 1982) ("[U]nless the plaintiff is entitled to recover on the contract, a bad faith claim cannot be maintained."). Further, even though the Alabama Supreme Court has recognized several "abnormal" cases of bad faith, "that recognition did not eliminate the requirement that the plaintiff prove an entitlement to benefits under the insurance policy." *Slade*, 747 So.2d at 318.

In short, contractual liability is a prerequisite to both "normal" and "abnormal" bad faith claims, and plaintiff accordingly has failed to establish a prima facie case of bad faith.

## D. Fraudulent Misrepresentation

Count V of plaintiff's complaint claims that Hartford, acting by and through its agent and employee Mary Parsons, intentionally or recklessly misrepresented material facts to plaintiff.[202]

---

[202] Notice of Removal (doc. no. 1), exhibit 1 (complaint), at ¶ 42.

Although the complaint alleges that Parsons made three different fraudulent statements,[203] the record reveals only that she told J.W. Blair and Lindsey Crisp that she could provide plaintiff with coverage that would protect it in the event of a class action lawsuit similar to the Tennessee suit that attacked check cashing businesses within that State.[204]

In order to establish a prima facie case of fraudulent misrepresentation under Alabama law, plaintiff must demonstrate: "(1) a false representation; (2) concerning a material existing fact; (3) which is relied upon by the plaintiff; and, (4) damage to the plaintiff as a proximate result of the false representation." *Dickinson v. Moore*, 468 So.2d 136, 137-38 (Ala. 1985). In addition, plaintiff must show that its reliance upon the alleged false representation was reasonable. *See Foremost Insurance Co. v. Parham*, 693 So.2d 409, 421 (Ala. 1997). In *Foremost*, the Supreme Court of Alabama returned to the "reasonable reliance" standard, which "allow[s] the factfinder greater flexibility in determining the issue of reliance based on all the circumstance surrounding a transaction, including the mental capacity, educational background, and bargaining power of the parties." *Id.* Further, the "reasonable reliance" standard provides

> a mechanism ... whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.

*Id.* In *Ex parte Seabol*, however, the Court held that summary judgment is not appropriate in fraud cases where the party claiming fraud in a particular transaction could not easily understand the documents, and was thereby unable to deduce that the representations upon which they relied were false. *Ex parte Seabol*, 782 So.2d 212, 216-17 (Ala. 2000).

---

[203] *Id.*

[204] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit B (J. W. Blair deposition), at 106; *id.*, Exhibit A (Crisp deposition), at 8.

This court concludes that plaintiff has failed to establish a prima facie case of fraudulent misrepresentation.

In the fall of 1995, plaintiff's president, J. W. Blair, and Chief Financial Officer, Lindsey Crisp, met with Mary Parsons to discuss the new company's insurance needs.[205] Blair told Parsons about a suit in which the Tennessee check cashing industry was attacked because of the service fees charged. He requested an insurance policy that would protect his companies "if that situation occurred in Alabama or North Carolina."[206] Blair testified that Parsons represented that she could provide insurance coverage that would protect Check Cashing Alabama, in the event a lawsuit was filed against it involving allegations similar to those made in the Tennessee suit.[207]

The undisputed facts establish that plaintiff did not rely on Parsons' representation. Although the *Austin* plaintiffs filed suit during March of 1998,[208] plaintiff did not notify Hartford or its agent company of the suit until October of 1998.[209] Rather than notifying Hartford, as required by the policies,[210] the Blairs contacted a lawyer of their own choosing and made two unsuccessful attempts to settle the claims against plaintiffs.[211] Only when those efforts were unsuccessful did plaintiff notify Hartford of the *Austin* suit. Thus, the court finds that plaintiff did not rely on the Parsons' representations.

Even assuming for the sake of discussion that plaintiff relied on the representations, the court

---

[205] *Id.*, Exhibit B (J. W. Blair deposition), at 42; *id.*, Exhibit A (Crisp deposition), at 10.

[206] *Id.*, Exhibit B (J. W. Blair deposition), at 45-46; *id.*, Exhibit A (Crisp deposition), at 10.

[207] *Id.* at 103; *id*, Exhibit A (Crisp deposition), at 8. Mary Parsons denies that Blair advised her of any Tennessee lawsuit or made any specific request for coverage. *Id.*, Exhibit E (Parsons deposition), at 53.

[208] *Id.*, Exhibit B (J.W. Blair deposition), at 71.

[209] *Id.* at 65.

[210] *See supra* notes 63-64 and accompanying text.

[211] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit B (J.W. Blair's deposition), at 163-65.

finds that plaintiff's reliance was not reasonable. Both Blair and Crisp had college degrees at the time the alleged misrepresentation was made. Blair held a business degree with a concentration in finance and human resource management.[212] Crisp, who was primarily responsible for insurance issues, held a degree in accounting and was licensed as a Certified Public Accountant.[213] Although Blair acknowledged receipt of the Hartford policies, he did not review the policies when they were delivered to his office.[214] Similarly, Crisp testified that he did not read the insurance policies when they were delivered and, in fact, no one at Check Cashing Headquarters read the policies in 1995, 1996, or 1997.[215] More importantly, he testified that he knew of no reason why he could not have understood the insurance policies, if he had taken the time to read them in 1995.[216] Thus, the court finds that plaintiff made a deliberate decision to ignore the written terms of Hartford's contracts and, thereby, unreasonably relied upon the verbal representations of the selling agent.

Plaintiff asserts that the Alabama Supreme Court's decision in *Seabol* precludes summary judgment in favor of defendants, because the policies contained ambiguous language regarding the definition of "bodily injury," which would have made it impossible for Blair and Crisp to discern whether the *Austin* lawsuit was covered, had they read the policies.[217] This argument misses the point.

Although Blair and Crisp believed that Check Cashing Alabama purchased general liability and umbrella policies from Hartford in 1995,[218] Mary Parsons testified that the company purchased

---

[212] *Id.* at 7.

[213] *Id.*, Exhibit A (Crisp deposition), at 6-7.

[214] *Id.*, Exhibit B (J. W. Blair deposition), at 109, 142.

[215] *Id.*, Exhibit A (Crisp deposition), at 33.

[216] *Id.* at 35.

[217] Plaintiff's brief in opposition to summary judgment (doc. no. 51), at 32-33.

[218] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit B (J. W. Blair deposition), at 51, 60; *id.*, Exhibit A (Crisp deposition), at 8.

only a workers compensation policy in 1995, and did not purchase a general liability or umbrella policy until October of 1997.[219] There is no objective evidence to the contrary. If Blair or Crisp had bothered to read the delivered policies, certainly they would have been able to discern that a workers compensation policy did not provide the coverage that Parsons had represented.

Even if Check Cashing Alabama had purchased general liability and umbrella policies in 1995 rather than in 1997 — two years after the alleged verbal misrepresentation — both policies limited coverage to "bodily injury," "property damage," "advertising injury," and "personal injury" caused by an "occurrence" within the coverage territory and during the policy period.[220] With respect to "bodily injury," both policies defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[221] As previously discussed, "accident" is an unambiguous term which is given its plain meaning.[222] Thus, if Blair or Crisp had read the policies, they easily could have (or should have) discerned that, contrary to Parsons' representations, the policies did not provide coverage that would protect plaintiff from damages caused by fees intentionally charged for the services provided by the company. This was true regardless of whether the allegations in the *Austin* complaint constituted "bodily injury" as defined by the policies.

Therefore, the court finds that plaintiff's reliance on Parsons' representation was unreasonable, and plaintiff's claim for fraudulent misrepresentation is due to be dismissed.

## E.    Fraudulent Suppression

---

[219] *Id.*, Exhibit E (Parsons deposition), at 46.

[220] *See supra* notes 41-51 and accompanying text.

[221] Defendant Hartford Casualty Insurance Company's evidentiary submission (doc. no. 40), Exhibit F (Butterwie deposition), exhibit 13 (Commercial General Liability Coverage Form), at ¶ V12, and exhibit 14 (Umbrella Liability Policy), at ¶ V(H)(1).

[222] *See* discussion *supra* pages 29-30.

Count VI of plaintiff's complaint asserts claims of fraudulent suppression against Hartford, BB&T Parsons, and Mary Parsons.[223] Plaintiff claims that Mary Parsons "concealed and suppressed the fact that Hartford would deny a claim by [plaintiff] for defense and indemnification as to acts such as those alleged in the [*Austin*] suit on the basis that such allegations were not covered by either the general or umbrella policy."[224]

To establish a prima facie case for fraudulent suppression under Alabama law, plaintiff must demonstrate "(1) the suppression of a material fact (2) that the defendant was under a duty to communicate (3) because of a confidential relationship between the parties or the circumstances of the case and (4) which caused injury as a proximate consequence." *Applin v. Consumers Life Insurance, Co.*, 623 So.2d 1094, 1098 (Ala. 1993), *overruled on other grounds*, *Boswell v. Liberty National Life Insurance, Co.*, 643 So.2d 580 (Ala. 1994).

If one receives documents from a defendant that put him on notice of the very facts alleged to have been suppressed, then that defendant cannot have suppressed those facts. *See. e.g., Robinson v. JMIC Life Insurance Co.*, 697 So.2d 461, 463 (Ala. 1997) ("[W]hen a party receives documents which put it on notice of facts, the facts cannot have been suppressed."); *Henson v. Celtic Life Insurance Co.*, 621 So.2d 1268, 1273-74 (Ala. 1993) (finding that where insurance application made numerous references to fact allegedly suppressed, no claim for suppression could lie); *Richardson v. Liberty National Life Insurance Co.*, 750 So.2d 575, 578 (Ala. Civ. App. 1999) (same holding).

Plaintiff received notice that Hartford's policies did not provide the coverage represented by Mary Parsons when the policies were delivered. If J. W. Blair or Lindsey Crisp had bothered to read the policies, they could have discerned that they did not provide coverage for damages caused

---

[223] Notice of Removal (doc. no. 1), exhibit 1 (complaint), at ¶ 47.

[224] *Id.*

by the company's intentional business practices.  Thus, plaintiff has failed to establish that the defendants suppressed a material fact.  Accordingly, plaintiff's claims for fraudulent suppression are due to be dismissed.

**F.     Abandoned Claims**

Count III of plaintiff's complaint asserts a claim of negligence and wantonness against Hartford.[225]  Count IV asserts a claim against Hartford and BB&T Parsons for negligent hiring, supervision, training, and retention.[226]  Although the defendants clearly argued in their motions for summary judgment that these claims are due to be dismissed, plaintiff failed to even mention these claims in its brief, much less articulate any reason why they should not be dismissed.

In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him."  *Ryan v. International Union of Operating Engineers, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  *See Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990).  "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

Therefore, the court finds that plaintiff has abandoned the claims alleged in Counts III and IV, and those claims are due to be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are due to be granted

---

[225] *Id.* at ¶ 31.

[226] *Id.* at ¶ 34.

on all of plaintiff's claims.  An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this 20ᵗʰ day of November, 2001

_____
United States District Judge